# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ALFONZO SANCHEZ,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 21-CV-4797** |
| | : | |
| **MR. PIROLLI,** *et al.*, | : | |
| **Defendants.** | : | |

## <u>MEMORANDUM</u>

**BAYLSON, J.**                                                            **JUNE 13, 2022**

In a prior Memorandum and Order, the Court[1] screened the Complaint filed by Plaintiff

Alfonso Sanchez, a prisoner held at Bucks County Correctional Facility ("BCCF"), pursuant to

28 U.S.C. § 1915(e)(2)(B) and permitted individual capacity retaliation claims against

Defendants Frank Bochenek, Dan Onisek and DiSandro to proceed.[2]  *See Sanchez v. Pirolli*, No.

21-4797, 2021 WL 6137076, at *1 (E.D. Pa. Dec. 29, 2021).  Other claims were dismissed

without prejudice and Sanchez was given the option to proceed only on the claims against these

Defendants or file an amended complaint to attempt to cure the defects the Court identified in the

claims that were dismissed without prejudice.[3]  Sanchez has now returned with a Second

---

[1] This case, originally assigned to Judge Gene E.K. Pratter, was reassigned to Judge Cynthia Rufe on January 12, 2022 (ECF No. 23.)  The case was reassigned to the undersigned on June 2, 2022.  (ECF No. 30.)

[2] Several of the Defendants' names were spelled differently in prior versions of Sanchez's pleading.  The Court will use the spellings contained in the Second Amended Complaint.

[3] The order that dismissed the original Complaint required that, if Sanchez chose to file an amended complaint, he would need to file a single complete document including all claims and the facts supporting those claims.  Any amended complaint would also need to repeat each of the claims that the Court has not yet dismissed — that is to say, the retaliation claims against Bochenek, Dan Onisek and DiSandro — if Sanchez wanted to proceed with those claims.  The

Amended Complaint (ECF No. 28 ("SAC"))[4] in which he again raises civil rights violations against numerous entities and officials associated with BCCF.[5]  For the reasons that follow, certain claims asserted in the SAC will be dismissed with prejudice and the balance of the claims will be served for a responsive pleading.

---

purpose of that Order was to ensure that Sanchez did not accidentally give up potentially viable claims by attempting to file piecemeal complaints.  On January 27, 2022, Sanchez filed a document purporting to be an "Amended Complaint."  (ECF No. 24.)  While Sanchez was warned that any claim not included in the amended complaint would not be considered part of this case, the pleading Sanchez labeled as an "Amended Complaint" did not attempt to reassert his claims.  Instead, the Amended Complaint largely objected to the Court's prior ruling and argued that discovery would permit Sanchez to prove his claims.  As written, the Amended Complaint excluded the claims that the Court did not dismiss.

In the interests of justice, and to protect Sanchez's right to assert the claims that had not been dismissed with prejudice, in a Memorandum and Order filed on March 2, 2022 (ECF Nos. 25, 26), the Court permitted Sanchez another opportunity to either (1) submit an amended complaint containing factual allegations supporting all of the claims Sanchez sought to pursue, or (2) notify the Court that he sought only to proceed on the claims that the Court did not dismiss earlier — specifically, his individual capacity claims against Defendants Bochenek, Onisek, and DiSandro for retaliation.  Sanchez returned with his pending SAC, which the Court will screen pursuant to 28 U.S.C. § 1915.

[4] In citing the SAC, the Court adopts the pagination supplied by the CM/ECF docketing system.

[5] The complete list of Defendants named in the SAC is:  Prime Care Medical, "Mental Health Dept. BCCF," Directors Pirolli and Kratz; Warden Metellus; Deputy Warden Reed; Deputy Warden Lagana; Deputy Warden Galione; Capt. Nottingham; Lt. Mazzocchi; Investigators Frank Bochenek, Dan Onisek and DiSandro; Assistant Director Coyne; Prison Oversight Board Members Robert Harvie, Jr., Diane M. Ellis-Marseglia, Gene DiGirolamo, Judge Wallace Bateman; District Attorney Matt Weintraub, Milt Warrell, Ann Russavage-Faust, Christine Shenk, Karen Dopson, Daniel Grace, and Sara Webster; Medical Department employees Nurse Eden, A. Lynn, Jane and John Doe, and Linda Oglen; Mental Health Department employees Mr. Russ, Ms. Jen, Ms. Sam, Rachel, and Dr. Cassidy.  All Defendants are named in their individual and official capacities.  (SAC at 3-4.)  The Court notes that Sanchez makes no allegations with regard to Defendant Oglen.  Accordingly, any claim against Defendant Oglen is not plausible and Oglen will be terminated as a Defendant.

## I.    FACTUAL ALLEGATIONS

Sanchez asserts that prior to November 5, 2020, he was placed in "admin lock" – the Court understands Sanchez to be referring to placement in the restricted housing unit ("RHU") for either administrative or disciplinary reasons – three times without any explanation or a chance to defend himself.  (SAC at 10.)  He asked his criminal defense attorney to contact Defendants Bochenek, Onisek and Disandro, but all three Defendants refused to speak with the attorney.  (*Id*.)  Several days later, he was summoned to meet with Bochenek, Onisek and Disandro.  When Sanchez asked why he was placed in admin lock, Defendant Bochenek allegedly told him "we don't have policy for admin lock we can do what we want, . . . what we want is for you to drop the law suit."[6]  (*Id*.)  Sanchez refused to do so and told them he would report them to their supervisors.  (*Id*.)  Bochenek then questioned whether anyone would believe Sanchez.  (*Id*. at 11.)

On November 5, 2020, Sanchez was put on "lock status . . . for a year or so."  (*Id*.)  Three months into this lock status, he was again summoned to a meeting with Bochenek, Onisek and Disandro.  (*Id*.)  When Sanchez again asked why he was on lock status, Bochenek replied "we can't tell you at this time but if you drop the lawsuit we'll take you off lock."  (*Id*.)  Sanchez again refused.  (*Id*.)  After the meeting, he wrote request slips to Defendants Pirolli, Reed and Metellus, and to members of the Prison Oversight Board ("POB").  (*Id*. at 12.)

---

[6] Sanchez does not identify the lawsuit to which he refers.  Presumably, this is a reference to *Sanchez v. Bucks Cty*., Civ. A. No. 18-5381 (E.D. Pa.), in which Sanchez sued Bucks County and Warminster Township officials for civil rights violations.  That case has been stayed pending the Commonwealth's retrial of Sanchez on criminal charges for which his original conviction was overturned due to a *Brady* violation and prosecutorial misconduct.  *See Commonwealth v. Sanchez*, No. 3368 EDA 2017, 2018 WL 3153778, at *2 (Pa. Super. Ct. June 28, 2018) (describing procedural history of the criminal case).

On February 11, 2021 Sanchez received a response from Onisek saying that charges against him were forthcoming, but Sanchez asserts he was not notified what the charges were until a month later.  (*Id*.)  At that time, he received a misconduct hearing by a non-defendant official named Ditman, who apparently convicted him of the misconduct and imposed a penalty of time served.  (*Id*.)  Nonetheless, he was kept on lock status, allegedly with no explanation.  He asserts that "50 plus inmates got the same charges as [he did] but was never put on long term isolation, other inmates only recieved [sic] 30 days or less of isolation/lock status."  (*Id*.)  He alleges he received no explanation of his status for "many months."  (*Id*. at 13.)

Sanchez alleges he was released from lock status on July 2, 2021.  The same day, District Attorney Mathew Weintraub "attempted to abuse his authority and defraud the courts by filing a bail motion to get Mr. Sanchez put back on lock status."[7]  (*Id*.)  Three weeks later, Sanchez was returned to lock status by Onisek and Disandro, allegedly without any explanation or due process.  (*Id*.)  He was allegedly informed "months later" that he was put on lock status due to a misconduct allegation involving the use of the telephone.  (*Id*.)  He asserts that, as of the time he filed the SAC, he had been on lock status for nine months.  (*Id*. at 14.)  He alleges that other inmates found guilty of this type of telephone infraction receive only ten days of lock status.

---

[7] Attached to the SAC is a copy of an emergency motion filed by Weintraub to modify Sanchez's bail and impose new bail conditions.  (ECF 28-1 at 10-17.)  The Commonwealth argued in the motion that Sanchez posed a danger to prisoners and staff at BCCF because he solicited multiple individuals to murder a witness in his homicide case.  (*Id.* at 11.)  While conceding that the Court could not specifically order officials at BCCF to keep Sanchez in administrative segregation, the District Attorney sought to modify his non-monetary conditions of release to include a condition that he have no contact with other incarcerated offenders, thereby requiring him to be detained in administrative segregation.  (*Id.* at 12-13.)

In the prior Memorandum and Order, claims against Weintraub based on his actions representing the Commonwealth in Sanchez's criminal case were dismissed on grounds of prosecutorial immunity.  *See Sanchez*, 2021 WL 6137076, at *6.  In the SAC, Sanchez appears to name Weintraub as a Defendant based on his membership in the POB, rather than based on actions he took as a prosecutor.

(*Id.*)  Sanchez wrote to Pirolli, Kratz, Lagana, Galione, Metellus, Reed, Captain Nottingham,
Lieutenant Mazzocchi, Coyne, Harvie, Ellis-Marseglia, DiGirolamo, Bateman, Weintraub,
Warrell, Russavage-Faust, Shenk, Dopson, Grace, and Webster to put them on notice that his
rights were being violated, but they all failed to act.  (*Id.* at 14-15.)  While on lock status,
Sanchez was denied recreation and showers for several months at a time and could not leave his
cell.  (*Id.* at 15.)  Sanchez notified the above listed Defendants about these conditions, but they
failed to act.  (*Id.*)  Also while on lock status, Sanchez broke a toe while sleeping on a bed that
"was not a legal standard restraint bed," and was housed in a cell with feces and other bodily
fluids all over the walls and toilet area.  (*Id.*)

Sanchez alleges that Bochenek, Onisek and Disandro attempted to recruit inmates to
make false accusations against him and inform on him.  (*Id.* at 17.)  They told inmates that
Sanchez was a murderer and gave them information about his criminal case so they could testify
that Sanchez confessed to them.  (*Id.*)  They also asked inmates to assert that Sanchez was
extorting them and opened his incoming and outgoing legal mail without him being present.
(*Id.*)  He asserts he was denied permission to call his attorneys for a year and his outgoing mail to
them went missing.  (*Id.*)  This allegedly caused him to miss out on "helping his attorneys filing
motions."  (*Id.*)  He asserts that Pirolli, Kratz, Lagana, Galione, Metellus, Reed, Captain
Nottingham, Lieutenant Mazzocchi, Coyne, Harvie, Ellis-Marseglia, DiGirolamo, Bateman,
Weintraub, Warrell, Russavage-Faust, Shenk, Dopson, Grace and Webster all denied request
slips he used to ask to speak with his attorneys.  (*Id.* at 18.)

Sanchez asserts he was approved to order orthotic sneakers due to nerve damage and
plantar fasciitis.  (*Id.*)  He ordered a pair of "Jordans custom made to be orthotic" but Nurse A.
Lynn denied his requested order.  (*Id.*; *see also* ECF No. 28-1 at 34 (advising Sanchez that "Nike

Jordans" brought by a family member "are not approved orthotic sneakers").)  He asserts that other inmates were approved for similar sneakers.  (*Id*.)  He suffers pain when he walks because he does not have orthotic sneakers.  (*Id*.)  Pirolli, Kratz, Lagana, Galione, Metellus, Reed, Captain Nottingham, Lieutenant Mazzocchi, Coyne, Harvie, Ellis-Marseglia, DiGirolamo, Bateman, Weintraub, Warrell, Russavage-Faust, Shenk, Dopson, Grace, and Webster all allegedly denied request slips about his sneaker issue.  (*Id*. at 19.)  A John or Jane Doe from the prison medical unit allegedly lied and falsified documents stating that inmates cannot have wraps, crutches, or canes in the RHU when other inmates do have them.  Apparently, Sanchez needed these items due to his broken toe, for which he was refused an x-ray.  (*Id*.; *see also* ECF No. 28-1 at 26 (response from Jane or John Doe to medical request stating that crutches are not permitted in the RHU).)  He asserts his broken toe was not treated, and he feels his bone separating and feels pain when he walks.  (SAC at 19.)  Nurse Eden allegedly told Sanchez to stop writing to medical because they are not going to do anything for him.  (*Id*. at 19-20.)  Sanchez also asserts that John or Jane Doe from medical "fabricated the x-ray report."  (*Id*. at 20; *see also* ECF No. 28-1 at 31 (x-ray report showing normal range results).)  He wrote to PrimeCare Medical to put it on notice that Eden, Lynn, and Doe failed to treat his medical needs but received no response.  (SAC at 20.)

Next, Sanchez alleges that an address book was stolen by Bochenek, Onisek and Disandro, causing isolation from his family and attorneys.  (*Id*. at 20-21.)  He notified "all named defendants apart of BCCF's administration" about getting his book returned, but it has not been returned to him.  (*Id*. at 21.)  He also asserts he has been denied visitation from family and friends and denied mental health services by Defendants Russ, Jen, Sam, Rachel, and Dr. Cassidy, as well as "all named defendants from the administration and over-sight board."  (*Id*.)

Due to his placement in isolation, Sanchez asserts he has suffered mental health injuries but has not received treatment. (*Id*. at 22.) He also asserts did not receive treatment for this toe and was refused orthotic sneakers. (*Id*.) For relief on his claims, Sanchez seeks to be transferred into the general population at BCCF, money damages, and all named Defendants be fired. (*Id*. at 23-24.)

As noted in the Court's prior Memorandum, *see Sanchez*, 2021 WL 6137076, at *3, public records reveal that Sanchez was convicted before Judge Alan Rubenstein of criminal homicide and related charges on October 22, 2008. *See Commonwealth v. Sanchez*, CP-09-CR-1136-2008 (C.P. Bucks). However, the convictions were reversed on January 26, 2017 through the grant of a petition under the Pennsylvania Post-Conviction Relief Act. *Id.* Thereafter, Sanchez's criminal case was heard before both Judge Rubenstein and Defendant Judge Wallace Bateman[8] and remains pending while an interlocutory appeal of a pretrial ruling is resolved. *Id.* In addition to his homicide charges, Sanchez was also charged on February 6, 2021 with being a member of a corrupt organization and with related controlled substances offenses. *See Commonwealth v. Sanchez*, CP-09-CR-3008-2021 (C.P. Bucks). Those charges also remain pending.

Sanchez has again appended to his pleading numerous copies of requests he forwarded to prison officials including Defendants Warden Reed (SAC at 42-49, 58-72), Investigators Bochenek, Onisek, and DiSandro (*id.* at 55), Director Pirolli (*id.* at 57), and Directors Metellus and Kratz (*id.* at 73, 88) seeking information why he was put under investigation or complaining

---

[8] In the prior Memorandum, claims against Judge Bateman in his individual capacity based upon his actions taken in his judicial capacity were dismissed on immunity grounds. *See Sanchez*, 2021 WL 6137076, at *4 n.5. The claims in the SAC appear to name Judge Bateman based upon his membership in the POB.

that he should not be held in administrative segregation.[9]  In November 2020, Reed informed

Sanchez that his status would be reviewed when the investigation of his activities was complete.

(*Id.* at 42.)  She informed him on November 28, 2020 that his grievance would be answered

within ten days.  (*Id*. at 45.)  On January 7, 2021, Reed stated she inquired the day before about

his status and will answer him when she has information.  (*Id*. at 47.)  On January 14, 2021,

Sanchez was told his placement was due to an "administrative decision to place you on RHU

status.  You will need to ask the Warden (Galione) about this."  (*Id.* at 49 (parenthetical in

original).)  The next day a different non-defendant official told him "until we are notified that the

investigation is complete, you will remain on the status."  (*Id.* at 51.)  In a reply dated February

4, Sanchez was told by Bochenek "refer to your [inquiry] dated 1-18-2021 you were informed of

the reason you are on locked/RHU status."  (*Id.* at 55.)  On February 17, 2021, Sanchez received

a reply to a letter he wrote to POB member Sara Webster in which Webster told him she

"checked with the prison who confirmed that indeed you had been under investigation and

therefore subject [to] confinement in your cell pending investigation of activities jeopardizing the

security of the institution."  (*Id.* at 83.)  On February 22, he was informed he was being held in

administrative segregation because "as you were previously told, charges are forthcoming."  (*Id.*

at 27.)  Sanchez was also told "your status is reviewed regularly."  (*Id.* at 58.)  On March 16,

2021, Reed told him his status was due to be reviewed again on March 26.  (*Id.* at 62.)  On April

1, Reed told Sanchez "you are on administrative lock for the safety and security of the institution

at this time.  Your status will continue to be reviewed regularly and when deemed appropriate

you lock status will be removed."  (*Id.* at 64.)  One week later, he was told "no further

---

[9] Other exhibits were mailed to the Clerk of Court separately.  (*See* ECF No. 27.)   The
Court will consider the separately filed exhibits to be part of the SAC since Sanchez specifically
noted that this was his intention.  (*Id.*)

explanation will be provided at this time.  Your status will be reviewed regularly."  (*Id.* at 66.)

Sanchez continued to seek monthly updates on his status and received a response for May, June,

and July.  (*Id.* at 68-72.)  As noted above, Sanchez was released from administrative segregation

in July but was again placed in restricted housing August 30, 2021.  He sent a request slip to

Defendants Metellus and Krouse on August 8 asking why he was being investigated.  (*Id*. at 73.)

Sanchez also wrote to "Monica" of the BCCF mental health unit stating that he was

hearing voices, having sleep disturbances and panic attacks, and requesting she have him moved

to a different cell block.  (*Id.* at 75-76.)  Finally, Sanchez has attached copies of numerous

grievance he filed with prison officials.  (*Id*. at 77-81, 84-85, 89-92.)

## II.    STANDARD OF REVIEW

Since the Court has granted Sanchez leave to proceed *in forma pauperis*, 28 U.S.C. §

1915(e)(2)(B)(ii) requires the Court to dismiss the SAC if it fails to state a claim.  Whether a

complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard

applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher

v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether

the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is

plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted).  "At this

early stage of the litigation,' '[the Court will] accept the facts alleged in [the *pro se*] complaint as

true,' 'draw[] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that]

complaint, liberally construed, . . . contains facts sufficient to state a plausible [] claim.'"

*Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting *Perez v. Fenoglio*, 792 F.3d

768, 774, 782 (7th Cir. 2015)).  Conclusory allegations do not suffice.  *Iqbal*, 556 U.S. at 678.

As Sanchez is proceeding *pro se*, the Court construes his allegations liberally.  *Vogt v. Wetzel*, 8

F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

## III.   DISCUSSION

The vehicle by which federal constitutional claims may be brought in federal court is Section 1983 of Title 42 of the United States Code, which provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  *West v. Atkins*, 487 U.S. 42, 48 (1988).

### A.   Official Capacity Claims

Sanchez has again named all Defendants in their official capacities.  Other than medical personnel, all Defendants appear to be Bucks County officials.[10]  The official capacity claims against employees of Bucks County are, in essence, claims against the employing municipal entity.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell v. N.Y.C. Dept. of Soc. Servs.*, 436 U.S. 658, 690, n.55 (1978)).

---

[10] While it is unclear whether the three citizen members of the POB, namely Defendants Dopson, Grace, and Webster, *see* https://www.buckscounty.gov/215/Prison-Oversight-Board (last viewed 4/18/22), may be deemed to be government officials capable of being named as defendants in their official capacities, for purposes of statutory screening the Court will liberally construe the SAC to assert such claims against all named Defendants without conclusively deciding the issue.  Official capacity claims against medical providers are discussed later.

To state a claim for municipal liability, a plaintiff must allege that the defendant's policies or customs caused the alleged constitutional violation. *See Monell*, 436 U.S. at 694; *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583-84 (3d Cir. 2003). The plaintiff "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the pleading standard. *McTernan v. City of York,* 564 F.3d 636, 658 (3d Cir. 2009).

Sanchez makes several allegations concerning policies and customs. First, he again asserts that Defendants Bochenek, Onisek, and DiSandro said "we don't have policy for admin lock we can do what we want." (SAC at 10.) An official capacity claim based on this policy allegation was previously found implausible because it did not assert that the constitutional violations alleged were *caused* by a municipal policy, as opposed to a lack of policy, and was too vague and insufficient to allege plausibly that Sanchez was injured due to a custom of Bucks County.

Second, citing the inmate handbook, Sanchez asserts that Bucks County has a policy that administrative segregation is not to be used for punishment and that inmates are to be treated equally and fairly. (*Id*. at 14.) Again, apparently citing the inmate handbook, he asserts there is a policy that inmates are to receive three showers each week and one hour of outside recreation. (*Id*. at 15.) These policy allegations fail too because they suggest that the actions giving rise to Sanchez's claims stemmed from an alleged failure to follow policy, as opposed to the policy itself. Further, as many courts have held, corrections officials cannot be held liable under § 1983 for failing to conform to policies and procedures outlined in inmate handbooks and other internal prison procedures. *Bowman v. Wetzel*, No. 20-135, 2020 WL 3258946, at *6 (W.D. Pa. June 16, 2020) (citing cases); *see also Curry v. McCann*, No. 18-5444, 2019 WL 77441, at *7 (E.D. Pa. Jan. 2, 2019) ("Even if Curry was asserting a claim against C.O. McCann based on this

questioning, 'a prison's departure from the policies and procedures outlined in the facility's handbook does not, in and of itself, amount to a constitutional violation actionable under § 1983.'") (citing *Laufgas v. Speziale*, No. 04-1697, 2006 WL 2528009, at *7 n.7 (D.N.J. Aug. 31, 2006)).

Sanchez next asserts there is a policy that prison staff may not open inmate legal mail outside the inmate's presence. (*Id*. at 17.) Finally, he asserts there is no policy governing what type of orthotic sneakers an inmate can receive, but there is a policy that inmates must receive required medical care. (*Id*. at 19-20.) These conclusory assertion falls far short of Sanchez's pleading requirement to identify custom or policy, and "specify what exactly that custom or policy was." *McTernan* 564 F.3d at 658. Accordingly, his official capacity claims will be dismissed.

### B.      Individual Capacity Claims

#### 1.      Retaliation Claims Against Bochenek, Onisek, and DiSandro

The Court previously determined that Sanchez had asserted plausible claims against Defendants Bochenek, Onisek, and DiSandro based on retaliation because he had filed an earlier lawsuit against Bucks County personnel. *See Sanchez*, 2021 WL 6137076, at *5. Because Sanchez again asserts these Defendants caused him to remain in administrative segregation unless he dropped his civil suit, the retaliation claim will be served on Bochenek, Onisek, and DiSandro for a responsive pleading.

#### 2.      Claims Based on Grievances

Sanchez again refers to numerous grievances he filed with prison officials concerning his placement in administrative segregation. He also appended numerous grievance forms to his Complaint. Claims based on the handling of prison grievances fail because "[p]rison inmates do

not have a constitutionally protected right to a grievance process." *Jackson v. Gordon*, 145 F. App'x 774, 777 (3d Cir. 2005) (per curiam); *see also Caldwell v. Beard*, 324 F. App'x 186, 189 (3d Cir. 2009) (per curiam). Accordingly, the facts alleged by Sanchez about grievances do not give rise to a plausible basis for a constitutional claim and will be dismissed with prejudice.

### 3. Claims Based on Disciplinary Segregation

In the prior Memorandum, the Court found that Sanchez failed to assert plausibly that he suffered a due process violation because of placement in disciplinary segregation, but was permitted an opportunity to amend the claim to cure the defects the Court identified. *See Sanchez*, 2021 WL 6137076, at *6.[11] As stated there, "'pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in [disciplinary segregation] without explanation or review of their confinement.'" *Id.* (quoting *Singleton v. Superintendent Camp Hill SCI*, 747 F. App'x 89, 92 (3d Cir. 2018) (*per curiam*) and *Bistrian v. Levi*, 696 F.3d 352, 375 (3d Cir. 2012)). With respect to pretrial detainees, "the imposition of disciplinary segregation for violation of prison rules and regulations cannot be imposed without providing the due process protections set forth in *Wolff v. McDonnell*, 418 U.S. 539 . . . (1974)." *Id.* (citing *Kanu*, 739 F. App'x at 116). Such protections "include the right to receive written notice of the charges at least 24 hours before the hearing, the opportunity to present witnesses and documentary evidence, and a written statement of the reasons for the disciplinary action taken and the supporting evidence." *Id.* (citing *Wolff*, 418 U.S. at 563-66); *see also Stevenson v. Carroll,* 495 F.3d 62, 70 (3d Cir. 2007).

---

[11] A due process claim based on Sanchez's placement in administrative segregation, as opposed to disciplinary segregation, was dismissed with prejudice. *Sanchez*, 2021 WL 6137076 at *7. To the extent Sanchez attempts to reraise it in the SAC, it is again dismissed.

13

In the SAC, Sanchez alleges that he was placed in disciplinary segregation by Defendants Onisek and DiSandro three weeks after the District Attorney filed the bail motion in his criminal case, without any explanation or due process.  He was allegedly not informed of the nature of the misconduct charge, a telephone use infraction, until months later.  He also alleges that other inmates found guilty of the type of telephone infraction receive only ten days of lock status.  (*Id.*)  The Court finds that the due process claims based on Sanchez's confinement in disciplinary segregation against Defendants Onisek and DiSandro pass statutory screening and will be served for a responsive pleading.

To the extent, however, that Sanchez attempts to allege this claim against Defendants Pirolli, Kratz, Lagana, Galione, Metellus, Reed, Captain Nottingham, Lieutenant Mazzocchi, Coyne, Harvie, Ellis-Marseglia, DiGirolamo, Bateman, Weintraub, Warrell, Russavage-Faust, Shenk, Dopson, Grace, and Webster because he filed grievances or wrote to them to put them on notice that his rights were being violated, the claim is not plausible.  "A defendant in a civil rights action must have personal involvement in the alleged wrongs" to be liable.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)).  A prison official's involvement in the grievance process, alone, is not actionable under § 1983.  *See Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews."); *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (*per curiam*) ("The District Court properly determined that Defendants [Superintendent] Wenerowicz,

Lewis, and Shaylor – who participated only in the denial of Curtis' grievances – lacked the requisite personal involvement [in the conduct at issue].").

### 4.    Access to Counsel Claim

Sanchez alleges that while he was in administrative segregation he was not allowed to contact his defense attorney.  (SAC at 18.)  "Under the Sixth Amendment, a pretrial detainee has a right to utilize counsel to defend against a criminal case that the state has brought against him." *Prater v. City of Philadelphia*, Civ. A. No. 11-1618, 2015 WL 3456659, at *4 (E.D. Pa. June 1, 2015) (on remand) (citing *Benjamin v. Fraser*, 264 F.3d 175, 186 (2d Cir. 2001)).  With respect to restrictions on attorney contact with clients, "[t]he Supreme Court [has] held that 'inmates must have a reasonable opportunity to seek and receive the assistance of attorneys' and that [prison] '[r]egulations and practices that unjustifiably obstruct the availability of professional representation . . . are invalid.'"  *Id.* at 184 (fourth alteration in original) (quoting *Procunier v. Martinez*, 416 U.S. 396, 419 (1974)).  Thus, where an institutional restriction impedes a pretrial detainee's access to criminal counsel, "'the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security.'"  *Id.* at 187 (quoting *Bell*, 441 U.S. at 547).  A prison regulation restricting a pretrial detainee's contact with his attorney will be unconstitutional where it "'unreasonably burden[s] the inmate's opportunity to consult with his attorney and to prepare his defense.'"  *Id.* (quoting *Wolfish v. Levi*, 573 F.2d 118, 133 (2d Cir. 1978)).

Sanchez's access to counsel claim in the original Complaint was dismissed without prejudice because it was undeveloped.  *Sanchez*, 2021 WL 6137076 at *8.  In the SAC, he alleges that he was denied the ability to contact his attorneys while he was in administrative segregation by Defendants Pirolli, Kratz, Lagana, Galione, Metellus, Reed, Captain Nottingham,

Lieutenant Mazzocchi, Coyne, Harvie, Ellis-Marseglia, DiGirolamo, Bateman, Weintraub, Warrell, Russavage-Faust, Shenk, Dopson, Grace, and Webster.  He alleges that this interference with his Sixth Amendment right caused him to miss out on "helping his attorneys filing motions."  (SAC at 17.)  He also alleges that Bochenek, Onisek and Disandro opened his incoming and outgoing legal mail, without him being present, misplaced outgoing legal mail, and denied him permission to call his attorneys for a year.  The Court concludes that these claims also pass statutory screening and will be served for a responsive pleading.[12]

### 5.    Conditions of Confinement Claims

While in administrative segregation, Sanchez was allegedly denied recreation and showers for several months at a time and could not leave his cell for recreation.[13]  He also asserts he was housed in a cell with feces and other bodily fluids all over the walls and toilet area.  The Due Process Clause of the Fourteenth Amendment governs claims brought by pretrial detainees concerning the conditions of their confinement.  *Hubbard v. Taylor*, 399 F.3d 150, 166 (3d Cir. 2005).  To establish a basis for a Fourteenth Amendment violation, a prisoner must allege that

---

[12] Sanchez also alleges that Bochenek, Onisek and Disandro attempted to recruit inmates to make false accusations against him and inform on him, told inmates that Sanchez was a murderer, and gave them information about his criminal case so they could testify that Sanchez confessed to them.  They also asked inmates to assert that Sanchez was extorting them.  While Sanchez included these allegations in the portion of the SAC where he describes his Sixth Amendment claims (*see* SAC at 17-18), these allegations do not implicate Sanchez's ability to contact his attorney and it is unclear why Sanchez included them there.

[13] The Court notes that Sanchez's lock status, during which he was allegedly denied regular showers and exercise, began approximately in November 2020, and lasted for a year or so.  This period corresponds with the period during which prison officials nationally were confronted with controlling the spread of the COVID-19 virus within institutions.  Sanchez does not mention whether any restrictions were due to the anti-COVID-19 measures.  At odds with the allegations about lack of showers and exercise is the content of an exhibit Sanchez attached to the SAC that indicates that he received showers each week and, in February 2021, yard privileges were cancelled for the entire institution due to inclement weather.  (SAC at 83.)

his conditions of confinement amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 538 (1979).

"Unconstitutional punishment typically includes both objective and subjective components."

*Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). "[T]he objective component requires an

inquiry into whether the deprivation was sufficiently serious and the subjective component asks

whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotations

and alterations omitted).

In that regard, "a 'particular measure amounts to punishment when there is a showing of

express intent to punish on the part of detention facility officials, when the restriction or

condition is not rationally related to a legitimate non-punitive government purpose, or when the

restriction is excessive in light of that purpose.'" *Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir.

2012) (quoting *Stevenson*, 495 F.3d at 68); *Steele v. Cicchi*, 855 F.3d 494, 504 (3d Cir. 2017).

Courts should consider the totality of the circumstances in evaluating such a claim. *Bistrian*, 696

F.3d at 373 ("In evaluating a pretrial detainee's claim of unconstitutional punishment, courts

must examine the totality of the circumstances within the institution."). Furthermore, "[i]n

determining whether restrictions or conditions are reasonably related to the Government's

interest in maintaining security and order and operating the institution in a manageable fashion,"

courts are obligated to keep in mind that "such considerations are peculiarly within the province

and professional expertise of corrections officials . . . ." *Stevenson*, 495 F.3d at 68 n.3.

Courts have held that allegations that housing detainees in unsanitary spaces does not

alone violate the detainee's due process rights. *See, e.g., Walker v. George W. Hill Corr.*, No.

18-2724, 2018 WL 3430678, at *3 (E.D. Pa. July 13, 2018) (concluding that plaintiff's claims

that "his sleeping area was a very unhealthy and unsanitary space two feet from the toilet bowl"

failed to state a Fourteenth Amendment claim with respect to allegations of overcrowding). The

denial of showers and exercise for short periods does not constitute the type of serious deprivation that amounts to a constitutional violation.  *See, e.g., Fortune v. Hamberger*, 379 F. App'x 116, 122 (3d Cir. 2010) ("Fortune complained of his inability to adequately shower and exercise for a period of fifteen days. Although it is not clear how many times Fortune believes that he should have been permitted to engage in those activities in addition to the time he was already given to do so, he does not allege that he suffered any harm as a result of the denial of additional showers and exercise."); *Coleman v. Hodges*, No. 18-1152, 2018 WL 6618459, at *8 (W.D. Pa. Nov. 30, 2018), *report and recommendation adopted*, 2018 WL 6618408 (W.D. Pa. Dec. 18, 2018) ("[B]eing denied a shower for four days does not constitute a serious enough deprivation of sufficient duration to establish a constitutional violation") (citing cases); *Barndt v. Wenerowicz*, No. 15-2729, 2016 WL 6612441, at *4 (E.D. Pa. Nov. 8, 2016), *aff'd,* 698 F. App'x 673 (3d Cir. 2017) (denial of showers and out of cell exercise for twenty-eight days did not violate Eighth Amendment when plaintiff did not suffer ill effects and had access to running water in his cell); *Barnes v. Cty. of Monroe*, 85 F. Supp. 3d 696, 738 (W.D.N.Y. 2015) ("To the extent Plaintiff alleges that his inability to shower over the course of four days constitutes a constitutional deprivation, his claim must fail.  Even a two-week suspension of shower privileges does not constitute a denial of 'basic hygienic needs.'" (quoting *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003)).

Sanchez alleges he was denied showers and exercise for "several months at a time" while he was on lock status.  (SAC at 15, 16.)  Sanchez asserts this claim against Defendants Pirolli, Kratz, Lagana, Galione, Metellus, Reed, Captain Nottingham, Lieutenant Mazzocchi, Coyne, Harvie, Ellis-Marseglia, DiGirolamo, Bateman, Weintraub, Warrell, Russavage-Faust, Shenk, Dopson, Grace, and Webster because they "failed to act after being put on notice."  (SAC at 16.)

The Court understands Sanchez to be attempting to hold these Defendants liable because they hold supervisory positions at BCCF or are members of the POB.

There are "two general ways in which supervisory prison officials may be liable for unconstitutional acts undertaken by subordinates." *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). First, a supervisor may be liable if he or she "'with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)). "Second, a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.* Generalized allegations that a supervisory defendant is "in charge of" or "responsible for" an office or facility are insufficient to allege personal involvement in an underlying constitutional violation. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)). Also, a supervisory prison official's involvement in the grievance process, alone, is not actionable under § 1983. *See Folk*, 741 F. App'x at 51; *Curtis*, 763 F. App'x at 263.

Sanchez's allegation that he notified the above listed Defendants about these conditions, but they did not act fails to allege a plausible claim based on supervisory liability. He does not assert that these Defendants established and maintained a policy, practice or custom which

directly caused the constitutional harm, and he does not allege any of them personally denied him showers or exercise privileges or directed he be housed in unsanitary conditions.  Rather, his claim appears to be solely based on these Defendants' alleged inaction when Sanchez filed grievances about these conditions.  For this reason, his claim is not plausible and will be dismissed.

### 6.    Property Loss Claims

Sanchez alleges that an address book was stolen from him.  In the prior Memorandum, the Court held that "a prisoner detained by Bucks County cannot state a constitutional claim based on the loss of his property because "'an unauthorized intentional deprivation of property by a [jail official] does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available.'"  *Sanchez*, 2021 WL 6137076, at *9-10 (quoting *Spencer v. Bush*, 543 F. App'x 209, 213 (3d Cir. 2013), *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)).  Because the Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Con. Stat. § 8541, provides Sanchez with a meaningful postdeprivation remedy for his property loss claim, *id*, his constitutional claim is not plausible and again must be dismissed.

### 7.    Visitation

Sanchez next asserts he was denied visitation by family and friends.  However, he fails to allege which, in any, of the named Defendants was personally involved in denying him visitation.  Accordingly, this claim is not plausible and will be dismissed.  *See Rode*, 845 F.2d at 1207.

8.      **Medical Claims**

Sanchez again raises medical claims concerning (1) the denial of orthotic sneakers, (2) the lack of treatment for his broken toe, and (3) the denial of mental health services.  To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.  "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted).  Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  A serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991).  Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation.  *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).  Furthermore, "[a] defendant in

a civil rights action must have personal involvement in the alleged wrongs" to be liable.  *See*

*Rode*, 845 F.2d at 1207; *Dooley*, 957 F.3d at 374.[14]

Sanchez asserts he was approved to order orthotic sneakers due to nerve damage and

plantar fasciitis, ordered a pair of "Jordans custom made to be orthotic," but Nurse A. Lynn

denied his requested order.  (SAC at 18.)  Nurse Lynn denied the request because the brand of

sneaker Sanchez ordered were not approved orthotic sneakers.  (ECF No. 28-1 at 34 (advising

Sanchez that "Nike Jordans" brought by a family member "are not approved orthotic sneakers").)

While Sanchez asserts that other inmates were approved for "similar" sneakers, he does not

assert that they were permitted the specific brand and model of sneaker he ordered, or provide

sufficient facts from which one could plausibly infer that these inmates were similarly situated to

Sanchez.  More importantly, Defendant Nurse Lynn's advising Sanchez that he could not wear

Jordan sneakers did not delay, deny, or prevent him from ordering orthotic sneakers that were

approved for use by inmates at BCCF.  For this reason, his claim concerning orthotic sneakers is

not plausible and will be dismissed.

Regarding the alleged lack of treatment for Sanchez's broken toe, he asserts that John or

Jane Doe from the prison medical unit allegedly lied and falsified documents stating that inmates

---

[14] "If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."  *See Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004); *see also Carter v. Smith*, 483 F. App'x 705, 708 (3d Cir. 2012) (per curiam) ("Prison officials cannot be held to be deliberately indifferent merely because they did not respond to the medical complaints of a prisoner who was already being treated by the prison medical staff.").  Since Sanchez asserts he was under the care of staff from the prison medical unit, he cannot assert a plausible deliberate indifference claim against the other named non-medical prison official Defendants.  Specifically, his claim that Defendants Pirolli, Kratz, Lagana, Galione, Metellus, Reed, Captain Nottingham, Lieutenant Mazzocchi, Coyne, Harvie, Ellis-Marseglia, DiGirolamo, Bateman, Weintraub, Warrell, Russavage-Faust, Shenk, Dopson, Grace, and Webster are liable because they all allegedly denied request slips about his orthotic sneaker issue (SAC at 19), is dismissed.

cannot have wraps, crutches, or canes in the RHU when, he asserts, other inmates have received them.  He also asserts that he was refused an x-ray, and John or Jane Doe fabricated a report to show he did have an x-ray.  Nurse Eden allegedly told Sanchez to stop writing to medical because they are not going to do anything for him.  The Court finds that these allegations state a plausible claim for denial of medical treatment for a serious condition and will be served for a responsive pleading on John or Jane Doe and Nurse Eden.

Sanchez asserts he was denied mental health services by Defendants Russ, Jen, Sam, Rachel, and Dr. Cassidy.  (SAC at 21-22.)  Sanchez also wrote to non-defendant "Monica" of the BCCF mental health unit stating that he was hearing voices, having sleep disturbances and panic attacks, and requesting she have him moved to a different cell block.  (*Id.* at 75-76.)  There is no suggestion, however, that Sanchez expressed these concerns to any of the named Defendants and he fails to allege that he otherwise communicated to a named Defendant what mental health condition he suffered that required treatment, and what services were delayed, denied, or refused. The allegation concerning Defendants Russ, Jen, Sam, Rachel, and Dr. Cassidy is wholly conclusory and thus fails to assert a plausible deliberate indifference claim.  *Iqbal*, 556 U.S. at 678.

Sanchez has also named PrimeCare Medical, the private contractor providing medical services at BCCF, as a Defendant.  The United States Court of Appeals for the Third Circuit has held that "a private health company providing services to inmates 'cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.'"  *Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015) (quoting *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003)).  Rather, in order to hold a private health care company like PrimeCare Medical, Inc. liable for a constitutional violation under § 1983, Sanchez

must allege the provider had "a relevant . . . policy or custom, and that the policy caused the

constitutional violation [he] allege[s]." *Natale*, 318 F.3d 575, 583-84 (citing *Bd. of the Cty.*

*Comm'rs of Bryan Cty., Oklahoma v. Brown*, 520 U.S. 397, 404 (1997)); *see also Lomax v. City*

*of Philadelphia*, No. 13-1078, 2017 WL 1177095, at *3 (E.D. Pa. Mar. 29, 2017) ("Because

[defendant] is a private company contracted by a prison to provide health care for inmates, . . . it

can only be held liable for constitutional violations if it has a custom or policy exhibiting

deliberate indifference to a prisoner's serious medical needs.") (citations and quotations

omitted).  Since Sanchez makes no allegation that medical treatment was delayed, denied, or

refused due to a policy of PrimeCare Medical, his claim against the company is not plausible and

will be dismissed.

     To the extent that Sanchez asserts claims against employees of PrimeCare Medical in

their "official capacities," such claims are not cognizable because PrimeCare Medical is a private

entity.  *See Owens v. Connections Cmty. Support Programs, Inc.,* 840 F.Supp.2d 791, 796 (D.

Del. 2012) ("Generally, a suit against a [ ] public officer in his or her official capacity is used to

compel that officer to take some official action [and that] concept . . . is inapplicable to suits

against private parties where the entity is also susceptible to suit.").  Even if official capacity

suits against individuals who work for private companies are cognizable, the suit would, in

effect, be one against the company for whom that individual works.  *See Graham,* 473 U.S. at

105.  Since Sanchez has not alleged a plausible claim against PrimeCare Medical directly, the

official capacity claims against PrimeCare Medical employees are also dismissed.  *Accord Burk*

*v. West*, No. 21-4968, 2021 WL 5758945, at *2 (E.D. Pa. Nov. 24, 2021).

     Finally, Sanchez has named the "Mental Health Dept. BCCF" as a Defendant.  The

United States Court of Appeals for the Third Circuit has made clear that a prison medical

department is not a "person" for purposes of § 1983 liability.  *Ruff v. Health Care Adm'r*, 441 F.

App'x 843, 845-46 (3d Cir. 2011) (citing *Fischer v. Cahill*, 474 F.2d 991, 992 (3d Cir.1973) (*per*

*curiam*).  Accordingly, any claims against the "Mental Health Dept. BCCF" are dismissed with

prejudice.

## IV.    CONCLUSION

For the foregoing reasons, the Court will direct service of Sanchez's Complaint against

the following Defendants to file a responsive pleading on the following individual capacity

claims:  (1) Defendants Frank Bochenek, Dan Onisek and DiSandro with regard to Sanchez's

claim of retaliation and interference with his legal mail and Sixth Amendment right to counsel;

(2) Defendants Onisek and DiSandro with regard to due process claims based on Sanchez's

confinement in disciplinary segregation; (3) Defendants Pirolli, Kratz, Lagana, Galione,

Metellus, Reed, Captain Nottingham, Lieutenant Mazzocchi, Coyne, Harvie, Ellis-Marseglia,

DiGirolamo, Bateman, Weintraub, Warrell, Russavage-Faust, Shenk, Dopson, Grace, and

Webster with regard to interference with Sanchez's Sixth Amendment right to counsel; (4)

Defendants John or Jane Doe and Nurse Eden with regard to the claim for denial of medical

treatment for Sanchez's broken toe.

All official capacity claims and all other individual capacity claims will be dismissed

pursuant to 28 U.S.C. § 1915(e)(2)(B).  As Sanchez has already given an opportunity to cure the

defects previously identified in his dismissed claims and has been unable to do so, the Court

concludes that further amendment would be futile.  *See Jones v. Unknown D.O.C. Bus Driver &*

*Transp. Crew*, 944 F.3d 478, 483 (3d Cir. 2019) (amendment by pro se litigant would be futile

when litigant "already had two chances to tell his story").  Accordingly, in the attached service

order, PrimeCare Medical, "Mental Health Dept. BCCF", Nurse Lynn, Linda Oglen, Mr. Russ,

Ms. Jen, Ms. Sam, Rachel, and Dr. Cassidy will be terminated as Defendants.

**BY THE COURT:**

**/s/ MICHAEL M. BAYLSON**

_____

**MICHAEL M. BAYLSON, J.**